Earl H. Snow v. Commissioner.
Earl H. Snow v. Commissioner
Docket No. 12141.
United States Tax Court
1949 Tax Ct. Memo LEXIS 124; 8 T.C.M. (CCH) 666; T.C.M. (RIA) 49180; July 25, 1949
*124 During 1941 the petitioner and his wife were engaged in a hatchery business consisting of a principal office and over twenty branch establishments, which they operated under an oral partnership agreement. The wife had contributed from her own funds substantial amounts in establishing the business, was responsible for its finances, and actively participated in the control and management of its affairs. In the absence of satisfactory records the respondent recomputed business income for 1941 on the basis of the available books, branch bank statements and canceled checks. The respondent increased the gross receipts of the business for 1941 by increasing sales at the home office and branch profits as reported, and by including in the gross receipts of the business sales made by the home office to its branches. Various deductions claimed by the partnership were disallowed in whole or in part. Respondent assessed deficiencies against the petitioner as the sole proprietor of the business and imposed in respect to the tax a 50 per cent addition for fraud under section 293 (b) of the Internal Revenue Code. Held, 1. That the petitioner and his wife each owned *125 an undivided one-half interest and were bona fide partners in the hatchery business during the taxable year 1941. 2. That the respondent's determination of partnership income for 1941 is approved for the failure of the petitioner to sustain his burden of proving that the respondent, in his reconstruction of business income, erred in any substantial respect. 3. That the respondent properly disallowed a portion of a deduction claimed by the partnership in 1941 for loss by fire. 4. That no part of any deficiency herein for the taxable year 1941 was due to fraud with intent to evade tax. Walter H. Maloney, Esq., for the petitioner. Jackson L. Boughner, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding *126 involves a deficiency in income tax for 1941 in the amount of $17,095.80 and a 50 per cent addition to the tax for fraud in the amount of $8,547.90. Petitioner raises the following issues, all of which relate to the taxable year 1941. 1. Whether the respondent was correct in taxing to the petitioner the entire income of a business on the basis that no valid partnership existed between the petitioner and his wife for Federal income tax purposes. 2. Whether the respondent, in redetermining business income, properly included in gross receipts "sales to branches" in the amount of $42,983.19. 3. Whether the respondent was correct in increasing the "branch profits" reported by the business by the amount of $14,718.83. 4. Whether the respondent was correct in disallowing $2,434.35 of a $3,413.40 deduction claimed by the business for loss by fire. 5. Whether respondent was correct in assessing against the petitioner a 50 per cent addition to the tax for fraud in the amount of $8,547.90. Petitioner does not contest or has abandoned objections originally raised in respect to various other adjustments made by the respondent in the notice of deficiency. In view of the respondent's *127 production of a properly executed waiver of the three-year statutory limitation on the assessment of the tax for 1941, the petitioner has also withdrawn his contention that the assessment and collection of the tax in issue is barred by the provisions of section 275 (a) of the Internal Revenue Code. Findings of Fact The petitioner, Earl H. Snow, is an individual residing in Sleepy Eye, Minnesota. During 1941 and for many years prior thereto, petitioner was engaged in a business known as "Snow's Hatcheries" which also had its principal office and place of business in Sleepy Eye, Minnesota. Petitioner filed a partnership return in the name of Snow Hatcheries and an individual income tax return for the year 1941 with the collector of internal revenue for the district of Minnesota, reporting for that year partnership net income of $1,497.96, and an individual net income of $923.98. The business of Snow's Hatcheries, hereinafter sometimes referred to as the partnership, consisted of the sale of feed, poultry remedies, small equipment and supplies for poultry, and baby chicks. In addition to the main office at Sleepy Eye, the business operated eight branch hatcheries *128 located in Canby, Mankato, Montevideo, Marshall, Pipestone, Tracy, and Worthington, Minnesota, and Brookings, South Dakota. The branch plants were owned by the partnership and were operated by managers who were paid salaries and did not share in the profits. Snow's Hatcheries also operated eight additional hatcheries, known as partnership hatcheries, at Alexandria, Bird Island, Le Sueur, Waseca, Faribault, Owatonna, Redwood Falls, and St. Cloud, Minnesota. The operators of these hatcheries received no salaries, the profits of each hatchery being divided equally between Snow's Hatcheries and the individual operator. Snow's Hatcheries also owned hatcheries at Litchfield, Prior Lake, and Farmington, Minnesota, which it operated on a rental basis. These plants were leased to an operator or manager who paid one-half cent for each egg which went through the incurbators. Hatcheries were also operated at New Ulm and Gaylord, Minnesota, by petitioner's daughter, and at St. James, Minnesota, by petitioner's son. The partnership had no interest in the income of these plants, but merely sold merchandise to each at wholesale prices. The various branch, partnership and rental hatcheries, *129 and those operated by petitioner's son and daughter will sometimes hereinafter be treated and referred to collectively as "branches." Snow's Hatcheries was established by petitioner and his wife, Nora Snow, in 1924. Petitioner was the inventor of the Snow incubator which was used in the business and, until recent years, the partnership, in addition to the selling of chicks, manufactured and sold Snow incubators. When the business was started in 1924, petitioner and his wife entered into an oral partnership agreement whereby they agreed to share equally in the business profits. Under this arrangement she was provided with a maid in the home and thereafter devoted her entire time to the business. Nora Snow provided money received from her family in starting the business and from time to time invested additional funds of her own in the business. She managed the financial end of the business from its origin in 1924 until the date of her death in November, 1942, and was in charge of the hiring of office help, the handling of orders for chicks, the keeping of the partnership books, and the purchase of equipment and supplies for her part of the business. It was her custom to travel with *130 the petitioner on frequent visits to the scattered branches and partnerships in which they were interested and personally check on the financial condition of each. She was recognized as a prominent business woman in the community. The properties used in the business were held in part in the name of Nora Snow, in the name of the petitioner, and some in joint tenancy. The tracts at Mankato, Marshall, and Litchfield were held in the name of Nora Snow, and those at Brookings, Canby, Worthington, Alexandria, Bird Island, Owatonna, and Redwood Falls were held in the name of the petitioner. No written partnership agreement was ever executed by the Snows, nor was any division of profits shown on the books of the business. The first partnership return was filed on March 25, 1942, for the taxable year 1941. The season in the hatchery business in Minnesota starts in February or March of each year and runs through late July. Before the opening of each season the partnership would open branch bank accounts, depositing therein working capital upon which the branch managers were authorized to draw for the purchase of eggs from local farmers and the payment of miscellaneous operating expenses. *131 These accounts could be drawn on by authorized employees of the branch and either of the Snows. The partnership's main office at Sleepy Eye delivered feed, supplies, and other items to the various branches, which were charged to the branches on the partnership books. Some of the grain used in the feed shipped from Sleepy Eye was raised on farms owned and operated by the Snows. When a shipment was made by the partnership from its main office to a branch, a sales slip was made out showing the date and the billing price. When the branch sent a check in payment, the date of the receipt of the check and its amount were entered on the books of the partnership. When the check was cashed, the date thereof was circled. Checks from the branches in payment for supplies were generally retained at the main office until the end of the hatching season. The checks were ultimately cleared through the bank or were taken to the branches by the Snows and exchanged for cash. The sales of feed and other poultry supplies to the eight partnership hatcheries and the three hatcheries operated by the petitioner's son and daughter were handled in the same manner as sales to the branch hatcheries. The *132 branch establishments sold the chicks they hatched and the feed and supplies forwarded to them by the main office. Their sales receipts were either deposited in the branch bank accounts or allowed to accumulate so that the Snows could personally pick up the cash. During 1941 the Snows, in the course of the season, collected cash from the various branches for which they gave the managers receipts. The branches maintained books and records showing their sales and expenses for the season. No entries were made on the partnership books or records disclosing the sales or expenses of the branch hatcheries incurred or paid locally. The books and receipts for cash collected by the Snows were forwarded by each branch to the main office at the close of the season but were not incorporated into the partnership books. The branch records and receipts for 1941 have since disappeared. The Snows have maintained since shortly after the business started a so-called "revolving fund" which at times has contained as much as $50,000. This fund was kept in safe-deposit boxes, the safe, in banks, and in the form of certificates of deposit, and was used to purchase properties and as a source of working *133 capital. Cash collected by the Snows from the branches was at times deposited in this fund. No record of this fund is now available. The partnership return for 1941 reported gross receipts of $91,480.35, including net income from branches in the amount of $25,438.95, which figure included $1,563.71 of rents and interest. Additional rents and income from interest of $3,380.65 and $1,436.24, respectively, were reported. The return also disclosed that the cost of goods sold was $32,710.38, which figure was determined under the inventory method. In redetermining petitioner's tax liability for 1941, respondent initially examined the partnership's books and records. Respondent discovered that neither a complete set of the sales order books, the canceled checks, nor the books and records of any branch were available. Such original records being either incomplete or unavailable, respondent recomputed the branch profits by examining the branch bank accounts, canceled checks, and the entries in the partnership's books and records. Respondent classified the money received by the partnership from its various branches as "branch profits," payment for "sales to branches," and return of working *134 capital advanced at the beginning of the season. By this method he determined that in 1941 the partnership received from sales to branches $42,983.19, or $4,359.72 more than the amount reflected in the partnership return, and "branch profits" of $40,066.09, which represented an increase of $14,718.83 over the $25,347.26 [1] reported in the return. Respondent also increased the retail sales receipts of the main office at Sleepy Eye from $27,509.62 to $29,275.80, an increase of $1,766.18. Petitioner does not contest the latter adjustment. The amounts of $4,359.72, $14,718.83, and $1,766.18 were included by respondent in the gross receipts of the partnership for 1941, which he determined as $112,325.08, or $20,844.73 more than reported by the petitioner. Respondent also determined that the partnership realized in 1941 rental income of $4,180.65 and interest income of $2,199.95. These amounts were reflected in the partnership return, $1,563.71 having been included in "branch income" on the return. On the partnership return, deductions *135 were claimed totaling $62,088.90. In the deficiency notice, respondent determined the total allowable deductions to be $41,888.22. Petitioner concedes the correctness of the deductions determined by respondent in the notice of deficiency with the exception of the disallowance of $2,434.35 of a deduction claimed by the partnership for fire loss in the amount of $3,413.40. On June 11, 1941, the Canby branch was destroyed by fire. The fire loss at Canby was reported by the partnership and was adjusted by respondent as follows: Per
Cor-
Dis-
Item
Return
rected
allowed
1. Building
$1,232.00
$632.60
2. Furniture and
Fixtures
40.00
17.45
3. Incubators
240.00
316.00
4. Fans
15.40
13.00
5. 30,000 eggs in in-
cubator
550.00
6. Boxes, feed, sup-
plies, etc.
856.00
7. 8,000 small chicks
480.00
Total
$3,413.40
$979.05
$2,434.35
The first four items were allowed by respondent in amounts equal to what he computed to be their undepreciated value. The last three items were disallowed on the basis that the costs had already been charged to expense and allowed as deductions. Accepting the respondent's adjustments to partnership income with *136 the exception of those relating to the recognition of Mrs. Snow as a partner, "sales to branches," "branch profits," and the deduction for loss from fire, petitioner admits a net income for the partnership in 1941 of $7,393.27 and an individual net taxable income of $3,996.64. During 1941 the petitioner and his wife, Nora Snow, operated the business of Snow's Hatcheries as a partnership in which each owned a one-half interest. No part of any deficiency for the taxable year 1941 was due to fraud with intent to evade tax. Opinion ARUNDELL, Judge: Petitioner's first contention is that the respondent erred in taxing the whole of business income for 1941 to the petitioner on the theory that the business was a sole proprietorship rather than a partnership in which the petitioner and his wife owned equal interests. Whether a partnership is valid for income tax purposes depends upon whether the parties really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses, or both. Commissioner v. Tower, 327 U.S. 280. The question of intent is to be determined from the nature of the agreement between the parties, *137 their conduct, their statements, the testimony of disinterested persons, their respective abilities and capital contributions, the actual control of income and the purposes for which it was used, and any other facts throwing light on their true intent. Commissioner v. Culbertson, U.S. (June 27, 1949). Petitioner presented evidence that Nora Snow provided capital originating with herself which she and petitioner used to establish the business, and that thereafter she contributed additional capital from time to time. All the evidence indicates that from the inception of the business she actively participated in its management, and assumed responsibility for the financial end of the business, its records and accounts, the handling of orders for baby chicks, and the management of the office. The testimony of various disinterested witnesses demonstrates that she was a capable business woman who was as active and as important in the operation of the business as her husband, the petitioner herein. Respondent argues that there was no written partnership agreement executed by the Snows, that no division of profits was disclosed by the books, and that 1941 was the first year in which a *138 partnership return was filed. He also points out that Nora Snow died in November, 1942, and that as yet her estate has not been probated nor has petitioner made any accounting for her interest in the partnership. These facts, he claims, indicate that no bona fide partnership existed between them. Cf. Weizer v. Commissioner, 165 Fed. (2d) 772. However, we are of the opinion that these considerations are more than outweighed by the other evidence herein, particularly the evidence of the capital and services contributed by petitioner's wife, her participation in the control and management of the business, and the uncontradicted testimony of disinterested witnesses acquainted with the conduct and understanding of the parties. These facts establish to our satisfactoin that from 1924 until the death of Mrs. Snow in 1942 she and petitioner really and truly intended to operate the business as a partnership and did so operate it. Therefore, it is our conclusion that the respondent erred in taxing the full amount of partnership income in 1941 to the petitioner. The second and third issues raised by petitioner relate to the adjustments made by the respondent to the partnership's *139 "sales to branches" and "branch profits." Respondent maintains that the gross receipts of the partnership in 1941 exceeded the amounts disclosed by the partnership's books and tax return. Therefore, the respondent on the basis of the partnership's books, branch bank accounts, and canceled checks redetermined the total receipts of the partnership, segregating the sums received by the Snows from various sources and classifying each as sales at the main office, branch profits, payments for merchandise, or the return of working capital advanced. Respondent determined that in 1941 the partnership had gross receipts of $112,325.08. [2] Sales at the home office were determined by the respondent as $29,275.80, which represented an increase of $1,766.18 over the $27,509.62 shown on the partnership books and reflected in its 1941 tax return. This adjustment is not contested by the petitioner. Respondent determined that the remaining $83,049.28 of gross receipts represented funds received by the partnership from its various branches in 1941. From an examination of the evidence above described, the respondent determined that this amount consisted of branch profits of $40,066.09, which represented *140 an increase of $14,718.83 over the net income from branches reported on the partnership return, and sales to branches of $42,983.19. The partnership return disclosed gross receipts of $91,480.35, including branch income of $25,347.26 and sales at the home office of $27,509.62. The $38,623.47 of reported receipts which were unidentified on the return were regarded by the respondent as representing sales made by the partnership to its branches. Therefore, the respondent's determination that actual sales to branches in 1941 amounted to $42,983.19, involves an increase of $4,359.72 in sales to branches as reported in the partnership return. The figures used by the partnership on its 1941 return in respect to branch income find no support in the partnership books and neither party herein has been able to satisfactorily explain the source of the amounts reported. The principal difficulty arises from the fact that the petitioner has not produced at the trial of this case, or for the use of the respondent in his investigation, any record of branch sales or profits. The books and *141 records maintained by the various branch hatcheries were delivered to the main office of the partnership at the close of each season, but these records were not incorporated in the partnership books and have since disappeared. The only evidence of branch finances now available are the accounts maintained on the partnership books which purport to show the shipments of supplies made to each branch. At best, these figures relate only to merchandise billed to the branches and although the petitioner claims that the price at which such goods were billed included the cost to the partnership, plus a delivery charge, no such allocation is indicated on the books, nor is there any means of verifying the claimed cost of these shipments which is significant in this case as it appears that some of the ingredients of the feed shipped to the branches were grown on farms owned and operated by the partnership. Moreover, if these accounts were accepted as a correct statement of sales to branches, it appears that the book figure would more closely conform to that used by the respondent than that reflected in the partnership return. Petitioner contends that as the merchandise was billed to the branches *142 at cost, plus a delivery charge, no income to the partnership could result, and further argues that the partnership should not report "sales to branches" as income. However, as the partnership received payment for the goods furnished the branches and on the return as filed there is deducted an item of $32,710.38 covering the cost of goods sold, which item the Commissioner accepts in his determination, it would appear that such "sales" should be included in the gross receipts of the business. It is true that the books and records of petitioner as offered in evidence disclose no inventory account, but as the Commissioner has accepted the petitioner's inventory figures appearing in the partnership return, we have no choice but to take the figures both have used. Petitioner no longer relies upon the figures shown in the 1941 return but instead claims that we should accept a recomputation of business income which was compiled by a tax consultant, now deceased, in connection with the Government's original investigation of his 1940, 1941, and 1942 income tax returns. In determining branch profits, this report totals "sales to branches" and receipts from branches insofar as disclosed by *143 the partnership books, but much like the petitioner's return, in computing income derived from the branches it necessarily resorts to figures not shown on the business books and records. Moreover, it does not substantiate the figures shown on petitioner's return, nor does it disclose the source of many of the figures used. For these reasons it is of little use in resolving the issues herein. Aside from the failure of the petitioner to produce records pertaining to the branch business and the insufficiency of the partnership's books, respondent points out that the manner in which the partnership conducted its business affairs supports his determination of unreported income in 1941. Checks received by the partnership from the branches were, at or near the end of the season, returned to the branches and exchanged for cash. Checks were traded between branches to save the expense of exchange through the banks. Cash from the sales receipts of the various branches was collected by the partners during the season and was accumulated in the drawer of a filing cabinet at the home office. Although some part of this money represented the working capital advanced to the branches at the beginning *144 of the season, petitioner testified that a portion of it may have represented branch profits. There is evidence that some of the cash so collected was added to the Snows' "revolving fund" and may not have gone through the partnership books. Petitioner concedes that at times this fund amounted to $50,000 but has produced no record of its source or disposition. The respondent's determination that the partnership realized branch profits in excess of the amounts reported for 1941 was substantiated by two of the branch managers who testified that the profits of their branches were substantially more than disclosed by the partnership return. Petitioner has produced no evidence whatever from which we can make an independent determination of his tax liability for 1941, nor has he shown that the respondent's determination as set out in the deficiency notice is erroneous. Although petitioner's task was unusually difficult due to the absence of reliable books and records and the loss of other sources of information since the respondent's original investigation, the sole responsibility for the lack of adequate evidence of partnership income rests squarely on the petitioner. Moreover, petitioner *145 was accorded ample opportunity to refute the respondent's determination by a cross-examination of the persons who actually computed the deficiencies in issue but no real effort was made to show wherein the respondent's method was wrong. Because of petitioner's failure to produce any satisfactory evidence to the contrary, we have no alternative but to sustain the respondent's determination that additional income was realized by the partnership in 1941 in the amount set out in the notice of deficiency. Petitioner acquiesces in the respondent's partial disallowance of various deductions claimed by the partnership with the exception of the disallowance of $2,434.35 of a fire loss claimed by the partnership in the amount of $3,413.40. Respondent computed the allowable loss on the basis of the undepreciated value of the building, incubators, fans, furniture and fixtures, and disallowed all loss on eggs, chicks and supplies, contending that the cost of these items had already been charged to expense and allowed as partnership deductions. In support of this deduction petitioner produced the manager of the Canby branch who testified at length as to the value of the assets destroyed. However, *146 petitioner produced no evidence of the original cost of the property, the depreciation previously claimed, or any explanation of whether the cost of items such as eggs, boxes, feed, and chicks had been claimed as a deduction for current expense by the partnership. Therefore, the respondent's determination must be sustained. Respondent further contends that the petitioner, with intent to evade tax, fraudulently understated his correct taxable income for 1941 and has imposed a 50 per cent addition to the tax for 1941 in accordance with the provisions of section 293(b) of the Internal Revenue Code. The burden of proving by clear and convincing evidence that part of the deficiency herein is due to fraud with intent to evade tax rests upon the respondent. The question of whether a taxpayer possessed a fraudulent purpose in understanding his true income is one of fact and must be determined from his conduct and all the material facts and circumstances. The respondent bases his allegation of fraud chiefly upon the state of business records. That the partnership books and records were wholly inadequate is obvious, but this fact does not itself show an intention *147 to evade tax. Since 1924, the petitioner has been engaged in a business which because of its nature and its scattered branch offices presented unusual accounting problems. It also appears that skilled personnel, capable of keeping adequate books and records was not available in the small towns in which the business operated. These factors may well have contributed to the poor quality of the business records. The partnership books were kept by the petitioner's deceased wife, Nora Snow, with the help of employees in the main office. Although petitioner was well acquainted with the financial condition of the business, it appears that he exercised no control and actually had very little knowledge of how the books were kept. Mrs. Snow's death undoubtedly made it difficult to explain the books and records as kept by her. The death of the tax consultant who prepared the report previously discussed herein and the loss of files and papers added to the difficulties of presenting a satisfactory record. The record contains ample evidence of incompetence and negligence in the keeping and handling of the partnership's books and records. Such conduct, however, in the circumstances here present *148 does not of itself constitute fraud, which requires a clear and convincing showing of an intent to evade tax. On the record as a whole, we are of the opinion that the respondent has failed to establish that any part of the deficiency herein was due to fraud with intent to evade tax. Therefore, his imposition of a 50 per cent addition to the tax for fraud under section 293(b) was in error. Decision will be entered under Rule 50. Footnotes
1. Respondent computed this figure by eliminating from the $25,438.95 reported as net income from branches a non-income item in the amount of $91.69.↩
2. This figure does not include partnership income from rents and interest in the amount of $6,380.60.↩